## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**ROBIN R. INGALLS**                                           **PLAINTIFF**

**V.**                     **No. 4:23-CV-00367-KGB-PSH**

**MARTIN J. O'MALLEY,[1] Commissioner,**
**Social Security Administration**                           **DEFENDANT**

## RECOMMENDED DISPOSITION

This Recommended Disposition ("Recommendation") has been sent to Chief United States District Judge Kristine G. Baker. Either party may file written objections to this Recommendation, and those objections should be specific and should include the factual or legal basis for the objection.

To be considered, objections must be received in the office of the Court Clerk within fourteen days of this Recommendation. If no objections are filed, Chief Judge Baker can adopt this Recommendation without independently reviewing the record. By not objecting, parties may also waive the right to appeal questions of fact.

### I.   **Introduction**:

Robin Ingalls applied for Title XVI disability benefits on August 13, 2019, at first alleging disability beginning December 6, 2018. (Tr. at 11). Her claim was

---

[1] Martin J. O'Malley was appointed to serve as the Commissioner of the Social Security Administration effective December 20, 2023. He has been substituted as the appellee in place of former Commissioner Kilolo Kijakazi pursuant to Fed. R. App. P. 43(c)(2).

denied both initially and upon reconsideration, and she requested a hearing before an Administrative Law Judge ("ALJ"). *Id*. During the hearing, Ingalls amended her alleged onset date to August 13, 2019. *Id*. On April 21, 2022, the ALJ denied Ingalls's application. (Tr. at 21). Thereafter, the Appeals Council denied her request to review the decision. (Tr. at 1). The ALJ's decision stands as the final decision of the Commissioner.

Ingalls now seeks judicial review, and for the reasons stated below, the Court should affirm.

## II.     The ALJ's Decision:

The ALJ found Ingalls had not engaged in substantial gainful activity since her alleged onset date of August 13, 2019. (Tr. at 14). At step two of the sequential five-step analysis,[2] the ALJ found Ingalls had the following severe impairments: chronic venous insufficiency, vision loss, and obesity. *Id*. After finding that none of these impairments or combination of impairments met or medically equaled a listed impairment, the ALJ determined that Ingalls would be able to perform light work with the following limitations: (1) she could not climb ropes, ladders, or scaffolds;

---

[2] Using a five-step sequence, the ALJ determines: (1) whether the claimant was engaged in substantial gainful activity; (2) if not, whether the claimant had a severe impairment; (3) if so, whether the impairment (or combination of impairments) met or equaled a listed impairment; (4) if not, whether the impairment (or combination of impairments) prevented the claimant from performing past relevant work; and (5) if so, whether the impairment (or combination of impairments) prevented the claimant from performing any other jobs available in significant numbers in the national economy. 20 C.F.R. § 416.920(a)(4).

(2) she could not perform work involving hazards including moving machinery and unprotected heights; (3) she could only occasionally climb stairs or ramps; (4) she could only occasionally balance, crawl, kneel, stoop, or crouch; and (5) she could not perform work requiring excellent vision but could avoid usual workplace hazards and work with small object like nails, bolts, and screws. (Tr. at 15).

Ingalls testified at the hearing regarding her claim of disability. (Tr. at 31). She had no past relevant work history. (Tr. at 20). Relying upon the testimony of a vocational expert ("VE"), the ALJ found that a significant number of jobs existed in the national economy for someone Ingalls's age with her education, work experience, and residual functional capacity ("RFC"). (Tr. at 20). These jobs included collator operator, garment bagger, and toll collector. (Tr. at 21). The ALJ concluded that Ingalls was not disabled. *Id*.

### III.   Discussion:

#### A. Standard of Review

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). The United States Supreme Court has held that "whatever the meaning of 'substantial' is in other contexts, the threshold for such evidentiary sufficiency [in Social Security Disability cases] is not high. Substantial evidence . .

. is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

It is not the task of the Court to review the evidence and make an independent decision. Neither is it to reverse the decision of the ALJ because there is contradictory evidence in the record. The test is whether there is substantial evidence in the record as a whole to support the decision of the ALJ. *Miller*, 784 F.3d at 477.

### B. Arguments on Appeal

Ingalls raises five arguments on appeal: (1) that the ALJ failed to develop the record adequately; (2) that the ALJ erred in identifying Ingalls's severe impairments; (3) that the ALJ improperly discounted Ingalls's subjective complaints of pain; (4) that the RFC did not sufficiently account for Ingalls's limitations; and (5) that the ALJ failed to resolve a conflict between the VE testimony and the *Dictionary of Occupational Titles* ("DOT"). As fully explained below, substantial evidence in the record supports the ALJ's decision and no legal error has been found.

#### 1. Record Development

For her first point, Ingalls asserts that the ALJ should have granted her request for additional consultative examinations. Four doctors—two consultative examining physicians and two state agency consulting physicians—evaluated Ingalls's functional abilities for the relevant period. Ingalls claims, however, that the ALJ

rejected the only treating physician's opinion as too remote; erroneously sought the opinion of an optometrist to examine Ingalls and evaluate her neurological eye impairment; and relied on an unqualified examining physician whose opinion was based on an unrelated impairment. Ingalls also argues that the state agency medical consultants neglected to factor her obesity into their opinions and relied on evidence predating the disability period. The ALJ found "that the record contains evidence of two consultative examinations as well as records from the claimant's own medical sources (including an orthopedic surgeon) and that there is no need to develop the record with additional consultative examinations." (Tr. at 11).

The claimant has the burden to offer the evidence necessary to make a valid decision about her claim. *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). An "ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Martise v. Astrue*, 641 F.3d 909, 926–27 (8th Cir. 2011) (internal citations and quotations omitted). The claimant "bears a heavy burden in showing the record has been inadequately developed [and] must show both a failure to develop necessary evidence and unfairness or prejudice from that failure." *Combs v. Astrue*, 243 F. App'x 200, 204 (8th Cir. 2007); *see also Haley v. Massanari*, 258 F.3d 742, 750 (8th Cir. 2001) ("reversal due to failure to develop the record is only

warranted where such failure is unfair or prejudicial") (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)).

Turning first to the medical evidence the ALJ found too remote, Ingalls saw Dr. Russell Allison in February 2018—eighteen months before the disability period—for pain in her right thumb, right index finger, and left index finger. (Tr. at 334). Dr. Allison noted that Ingalls's symptoms had improved with anti-inflammatory medication and suggested continued observation with Ingalls returning if the pain or symptoms returned. (Tr. at 334-36). Thereafter, Ingalls saw orthopedic specialist Dr. Owen Kelly on August 3, 2020. (Tr. at 570). She complained of right elbow pain that had lasted for one week. *Id*. Her right elbow showed tenderness, and she had pain with gripping and with terminal extension of the elbow. (Tr. at 571). She had full flexion of the elbow, however, and there was no erythema and minimal swelling. *Id*. Dr. Kelly diagnosed lateral epicondylitis and recommended conservative treatment of anti-inflammatories, a brace, and occasional injections. *Id*.

Ingalls complains that Dr. Allison provided the only treating physician evidence, yet the ALJ rejected Dr. Allison's evaluation as too remote. To the extent Ingalls is arguing that the record was not sufficiently developed because her RFC had to be based on a treating physician's medical opinion, she is incorrect. There is no requirement that an RFC be supported by a specific medical opinion. *Hensley v.*

6

*Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Moreover, current regulations require the ALJ to weigh multiple factors when evaluating medical evidence rather than assign specific deference to treating physicians. *See Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022). Nonetheless, the ALJ's finding that Dr. Allison's evaluation was too remote in time is reasonable considering Dr. Kelly's more timely examination, and the fact that both Dr. Allison and Dr. Kelly prescribed similar conservative treatment.

Next, Dr. Paul Misischia, an ophthalmologist, examined Ingalls on August 12, 2020. He found she had "moderate blepharospasm" (uncontrolled eye movement, such as blinking or twitching) and "age-related cataracts." (Tr. at 578). Ingalls reported to Dr. Misischia that she had surgery for her blinking in 2018 but that the condition had worsened and that she was receiving Botox injections every three months with limited success. (Tr. at 575). Following the examination, Dr. Misischia recommended a new prescription to sharpen Ingalls's vision. (Tr. at 578). He noted that she needed no assistance around the clinic and found the visual field change and test reliability "questionable." (Tr. at 578, 580). The ALJ found Dr. Misischia's opinion persuasive and within his area of expertise. Although Ingalls argues that Dr. Misischia was not the appropriate type of doctor—asserting incorrectly that he was an optometrist—and that he did not conduct a sufficient examination, the record does

7

not support that claim.[3] Dr. Misischia completed a full ophthalmologic examination, evaluating her blepharospasm and eyesight.

Ingalls was also seen in person by Dr. Terrell Bibb on August 15, 2020. He indicated that Ingalls reported chronic worsening low back pain.[4] (Tr. at 584). Dr. Bibb noted that Ingalls had a history of rheumatoid arthritis and peripheral vascular disease and past surgeries on her right wrist and elbow and left elbow. *Id*. In his physical examination, Dr. Bibb found that Ingalls had a normal gait, was able to rise from a sitting position without assistance, had full grip strength and dexterity, had full motor strength in all muscle groups, was able to heel and tandem walk without difficulty, and was able to bend and squat. (Tr. at 585-86). Dr. Bibb concluded that Ingalls could sit, walk, and stand for a full workday and lift and carry up to fifty pounds. (Tr. at 586). Finding Dr. Bibb's opinion persuasive, the ALJ nevertheless found that Ingalls's obesity and chronic venous insufficiency required a more restrictive RFC. (Tr. at 19-20). Although Ingalls argues that Dr. Bibb was unqualified to issue a medical opinion, calling him an "out of state ENT" and a medical resident, she has failed to identify any evidence to support her claim that he

---

[3]Optometrists are not medical doctors; ophthalmologists are medical doctors and "the most qualified among eye care professionals to diagnose and treat a wide range of eye diseases, beyond the routine eye and vision care provided by an optometrist." *What is an Ophthalmologist vs Optometrist?*, American Academy of Ophthalmology, https://www.aao.org/eye-health/tips-prevention/what-is-ophthalmologist.

[4]Ingalls reported the onset of low back pain in July 2019 as well. (Tr. at 463).

was unqualified. She additionally asserts that Dr. Bibb's opinion should be disregarded because he diagnosed her with low back pain, an impairment not found by the ALJ. However, Dr. Bibb performed a full physical examination of Ingalls, including her ability to walk, stand, sit, and transition, and it was appropriate for the ALJ to consider Dr. Bibb's opinion.

As for Ingalls's chronic venous insufficiency, records from July 2019 show that she sought treatment with her primary care provider for swelling, numbness, and tingling in both feet. (Tr. at 480).  She was evaluated at Arkansas Heart Hospital a few months later, where a venous mapping ultrasound revealed that she had reflux in both legs but no deep venous thrombosis in either extremity. (Tr. at 460-61). Ingalls was directed to wear compression stockings, perform calf-pumping exercises, and elevate her extremities while sitting. (Tr. at 466). Radiofrequency ablation was offered as a possible treatment procedure in January 2020. (Tr. at 551). Treatment records show that Ingalls did not comply with the recommendation to wear compression stockings. *Id*.  When Ingalls sought treatment in January 2022, she was once again advised on conservative treatment options—compression stockings and calf-pumping exercises—with the possibly of the ablation procedure. (Tr. at 939). The ALJ noted that the record was devoid of any further records on that impairment. (Tr. at 17).

The ALJ also had the benefit of opinions from two non-examining consultants, Dr. James Hazelwood and Dr. Rita Allbright. Despite Ingalls's claim otherwise, both doctors cited to records during the relevant period to support their opinions. (Tr. at 84-85, 105-106). Indeed, both doctors also noted Ingalls's obesity and her doctor's treatment recommendation of weight reduction. (Tr. at 84, 105). Dr. Hazelwood found that Ingalls could lift and carry twenty pounds occasionally, lift and carry ten pounds frequently, and stand or walk for six to eight hours in a workday. (Tr. at 83-85). Dr. Allbright concurred with Dr. Hazelwood's opinion but found Ingalls was limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 102-06). Although the ALJ found these opinions somewhat persuasive, he ultimately determined that Ingalls had additional limitations due to her bilateral blepharospasm.  (Tr. at 20).

Finally, the ALJ heard from Ingalls regarding her functional limitations. She stated that she did not believe that her weight contributed to her medical conditions in a significant way. (Tr. at 34). She stated that her eye spasms, leg swelling, fibromyalgia, and rheumatoid arthritis prevented her from working. *Id*. She testified that her eyes would slowly close and be hard to open. She stated that her eyes were "real blurry." (Tr. at 35). She asserted that surgery did not fix the problem and instead made it worse. (Tr. at 35-36). She received Botox injections every three months, which she said helped for only "five or six days." (Tr. at 36). She stated that

10

her doctor advised her not to drive because of the condition and that she had not been able to "watch a full movie in a while." (Tr. at 36-37).

Ingalls has failed to establish that she was prejudiced by a deficient record. To the contrary, the record in this case is quite robust. Before the ALJ were various medical treatment records regarding Ingalls's impairments and functional abilities. The ALJ had results from medical tests, treatment notes from multiple physicians, opinions from examining physicians, and opinions from two consulting physicians. The ALJ also had disability reports, questionnaires filled out by Ingalls, and her testimony at the hearing. While Ingalls disagrees with the decision the ALJ formed based on the evidence in the record, she has not shown the record was deficient.

2.  Severe Impairments

In her second point, Ingalls submits that the ALJ failed to account for impairments that had been found in a prior disability determination, failed to consider new evidence of Ingalls's chronic conditions, and mischaracterized Ingalls's blepharospasm as a decrease in visual acuity rather than a literal lack of vision. Ingalls maintains that the ALJ's failure to consider all severe impairments properly at step two materially affected the remainder of the sequential evaluation, requiring reversal.

To be considered severe, an impairment must significantly limit an individual's physical or mental ability to perform basic work activities. 20 C.F.R. §

416.922. An impairment is not severe if it is a slight abnormality or combination of slight abnormalities that have no more than a minimal effect on the ability to do basic work activities. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). The claimant bears the burden of proving the severity of an impairment or combination of impairments. *Id*. at 708 (noting that although the requirement is not "onerous," it is not a "toothless standard").  Once the ALJ identifies a severe impairment and proceeds past step two, the labeling of an impairment as severe or non-severe has no legal significance; the medical record as a whole provides the basis for the determinations at steps three and four.  *See* 20 C.F.R. § 416.945(a)(2); Social Security Ruling (SSR) 96-8p (the ALJ will consider all medically determinable impairments, even those that are non-severe, when assessing RFC).

To the extent that Ingalls is arguing that the ALJ should have given weight to severe impairments found in a previous disability determination, that argument is without merit. The previous decision was for a different disability period, and res judicata bars subsequent applications for disability based on the same facts and issues the Commissioner previously found to be insufficient to prove the claimant was disabled. *Hillier v. Soc. Sec. Admin.*, 486 F.3d 359, 364 (8th Cir. 2007). Evidence that was relied upon in the previous adjudication cannot be reevaluated in the subsequent proceeding. *Robbins v. Sec'y of Health & Hum. Servs.*, 895 F.2d 1223, 1224 (8th Cir. 1990). The only exception is where the prior medical evidence

serves as background for new and additional evidence of deteriorating mental or physical conditions occurring after the prior proceeding. *Id*.

Here, the ALJ considered Ingalls's relevant medical history of carpal tunnel, rheumatoid arthritis, and fibromyalgia. (Tr. at 14-15). The ALJ noted that Ingalls underwent carpal tunnel release on her right upper extremity in 2015 and left elbow surgery in 2016. (Tr. at 14). He noted that her fibromyalgia was stable and that she had no rheumatoid arthritis manifestations. (Tr. at 14-15). In finding that those impairments were not severe for the current disability period, the ALJ cited recent medical evidence establishing the conditions required only conservative treatment. *Id*. For instance, Ingalls saw Bonita Westwood, APRN, on July 27, 2020, for right elbow pain. (Tr. at 791). Notes from her examination state "ttp anterior right elbow, tendon insertion site, full passive ROM, limited active ROM due to pain, grip R<L." (Tr. at 793). Westwood referred Ingalls to Dr. Owen Kelly, an orthopedic specialist. *Id*. As noted earlier in this Recommendation, Dr. Kelly diagnosed Ingalls with lateral epicondylitis and recommended conservative management. (Tr. at 571). Thereafter, Ingalls saw Westwood again for "med ref." (Tr. at 786). Treatment notes reflect the exact same comment regarding Ingalls's right elbow ("ttp anterior right elbow, tendon insertion site, full passive ROM, limited active ROM due to pain, grip R<L"), but this time the notes do not include any referral or treatment for that pain. (Tr. at 788). Also noted was that Ingalls's fibromyalgia was "stable." *Id*. The record

contains no other medical records related to fibromyalgia, rheumatoid arthritis, or carpal tunnel during the relevant period. There simply is no evidence of deterioration related to her prior severe impairments. In fact, the evidence supported that she was stable and receiving only conservative treatment for those impairments.

Although Ingalls claims on appeal that the ALJ misunderstood her eye condition, the record is clear that the ALJ properly appreciated Ingalls's blepharospasm and related vision loss. (Tr. at 18-19). The ALJ detailed Ingalls's eye symptoms and treatment, including surgery she had in May 2019 and ongoing Botox injections. (Tr. at 16). The ALJ cited treatment notes indicating that Ingalls's symptoms had improved after each intervention but did not completely resolve. (Tr. at 19). Ultimately, the ALJ found that Ingalls's ability to benefit from treatment was not consistent with the severity of symptoms and limitations she claimed and found Dr. Misischia's opinion, noting the possibility of malingering, persuasive. *Id.*

On this record, the ALJ did not err. Nevertheless, any error in not finding an impairment severe at step two was cured when the ALJ considered all the claimant's medically determinable impairments, including those that were not severe, when determining her RFC. (Tr. at 15).

### 3.  Subjective Complaints of Pain

For her third point, Ingalls asserts that the ALJ erred by discounting her subjective complaints of pain. Specifically, Ingalls argues that the ALJ mistakenly

focused on her use of alcohol and cigarettes, improperly considered her use of a cane for assistance, and mischaracterized her improvement following eye surgery and Botox treatment.

When evaluating a claimant's subjective complaints of pain, the ALJ must consider objective medical evidence, the claimant's work history, and other evidence relating to (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) the claimant's functional restrictions. *See Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019). "[T]he duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the claimant's complaints of pain . . . and whether the evidence so contradicts the claimant's subjective complaints that the ALJ could discount his or her testimony as not credible." *Masterson v. Barnhart*, 363 F.3d 731, 738-39 (8th Cir. 2004). Where an ALJ explicitly considers the relevant factors but then discredits a claimant's complaints for good reason, the decision should be upheld. *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001).

The ALJ found that Ingalls's medically determinable impairments could reasonably cause some of her alleged symptoms but that her claims regarding the intensity, persistence, and limiting effects of her symptoms were not consistent with medical evidence and other evidence in the record. (Tr. at 16-17). Regarding venous

insufficiency, the ALJ noted relatively conservative treatment recommendations, which included wearing compression garments, doing calf-pumping exercises, elevating her legs while sitting, and reducing weight. The ALJ found that Ingalls had been noncompliant with those recommendations. (Tr. at 17). Between July 2019 and January 2022, Ingalls was advised multiple times to wear compression stockings, but she failed to do so. *Id*. Ingalls claimed the compression garments caused pain, caused edema, and created sores on her legs. (Tr. at 550). Despite her objections, medical professionals continued to recommend wearing the compression garments at each visit to ameliorate her symptoms. Both conservative treatment and noncompliance with medical recommendations are valid considerations when evaluating the validity of an alleged disability. *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001); *Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015). As for Ingalls's allegation that she did not have the financial resources to obtain appropriate medical care for her venous insufficiency, the ALJ noted that she had not contacted any charitable organizations in her area for assistance and continued to spend money on alcohol and cigarettes.[5] *See Riggins v. Apfel,* 177 F.3d 689, 693 (8th Cir. 1999) (holding that failure to forgo smoking to help finance pain medication distracted from allegations of disability); *Murphy v. Sullivan,* 953 F.2d 383, 386–87 (8th Cir.

---

[5]Ingalls admitted to smoking half a pack of cigarettes daily and regularly drinking alcohol throughout the disability period. (Tr. at 409, 432, 449, 478, 481, 484-485, 505, 516, 560, 563, 779, 783, 787).

1992) (rejecting claim of financial hardship where there was no evidence that claimant attempted to obtain low cost medical treatment or that claimant had been denied care because of her poverty).

Regarding her use of a cane for ambulation, the ALJ appropriately considered her inconsistent use as one factor in evaluating her credibility. Ingalls testified that her legs swell "really bad" after standing for fifteen to twenty minutes. (Tr. at 37). She also stated that they swell after sitting for "long periods of time." *Id*. She testified that she had been prescribed a cane because the swelling caused problems with her balance. (Tr. at 39). The ALJ noted that Ingalls's testimony contradicted treatment notes showing that Nurse Westwood prescribed the cane in March 2018 at Ingalls's request, a year prior to her complaints of lower limb swelling. (Tr. at 17). The ALJ also pointed out that other evidence in the record conflicted with Ingalls's testimony, including her physical evaluation with Dr. Bibb in August 2020 where she demonstrated normal gait, was able to rise from sitting without assistance, and walked and squatted without difficultly. (Tr. at 17-18). The ALJ further identified more recent records from Arkansas Heart Hospital indicating that Ingalls did not require a cane and had no recent falls. (Tr. at 18). The ALJ found that Ingalls's testimony regarding her use of a cane was not consistent with observations of her medical providers. *Id*.

As for Ingalls's claim that the ALJ did not properly consider her continued blepharospasm symptoms, the ALJ noted Dr. Misischia's observation that Ingalls's visual field change and test reliability were questionable in both eyes. (Tr. at 580). Evidence of malingering supports an ALJ's determination to discount a claimant's complaints. *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Additionally, Ingalls reported improvement in her symptoms following both eye surgery and Botox treatment. (Tr. at 18). She reported improvement for two weeks in September 2018, four weeks in October of 2018, and two weeks in January 2019. *Id*. Following her bilateral total myectomies in July 2019, she stated that the spasms were not as severe. *Id*. In February 2021, she stated that her symptoms never went away but had eased. *Id*. The ALJ found that her ability to benefit from treatment was not consistent with the alleged severity of her symptoms and limitations. *Id*.

The ALJ also considered Ingalls's ability to perform daily activities in evaluating her subjective complaints of pain. At the hearing, Ingalls testified that her eyes "constantly . . . close for a little period of time, and it's really hard to try to get them to open." (Tr. at 35). She stated that she had to use her fingers to push them open. *Id*. She said that "sometimes, my eyes will just be real blurry." *Id*. She testified that she could not watch "a full movie" because she would have spasms within an hour and a half to two hours. (Tr. at 36-37). However, she also reported that she was

able to prepare her own meals daily; perform household chores such as laundry; shop in grocery stores; pay bills; and attend to her personal needs. (Tr. at 237-40).

Here, the ALJ identified multiple valid reasons for discounting Ingalls's subjective complaints of pain, including her relatively conservative treatment history, non-compliance with medical recommendations, discrepancies between her the severity of her symptoms and evidence in the record, symptom improvement with treatment, possible malingering, and her ability to perform daily activities inconsistent with her claim of disabling pain and limitation. As such, substantial evidence supports the ALJ's finding on this point.

### 4. RFC

Ingalls asserts that the ALJ, in determining her RFC, erred by misunderstanding her eye condition and resultant vision loss; finding that she could perform light work without stand or walk limitations despite her chronic venous insufficiency; declining to include a handheld ambulation device or including a limitation that she be allowed to elevate her lower extremities throughout the workday; and basing his decision on unreliable, unqualified medical opinion evidence.

A claimant bears the burden of establishing her RFC, which is the most she can still do despite her limitations. 20 C.F.R. § 416.945(a)(1). In determining the claimant's RFC, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting,

considering all impairments. *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996). An ALJ must review all the relevant medical and other evidence in the case record when determining a claimant's RFC but is not required to include limitations that are not supported by the evidence in the record. *See McGeorge v. Barnhart*, 321 F.3d 766, 769 (8th Cir. 2003); 20 C.F.R. § 416.945(a)(3). "The mere fact that some evidence may support a conclusion opposite" to the ALJ does not allow for reversal. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004). Ultimately, the RFC finding "is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records." *Norper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020).

The ALJ considered the opinions of several medical professionals in determining Ingalls's RFC, and her claim that those doctors are unqualified and unreliable is not supported by the record before this court. Dr. Bibb examined Ingalls in August 2020 and noted she demonstrated normal gait, was able to rise from sitting without assistance, was able to tandem walk without difficulty, and was able to bend and squat. (Tr. at 17-18). Dr. Bibb posited that Ingalls could perform work at a light exertional level. (Tr. at 102). The ALJ found Dr. Bibb's opinion persuasive but fashioned a more restrictive RFC due to Ingalls's chronic venous insufficiency and obesity. (Tr. at 19-20). Dr. Paul Misischia examined Ingalls in August 2020 and found that she had moderate blepharospasm that had been treated with surgery and

Botox injections. (Tr. at 577-78). Dr. Misischia questioned the reliability of Ingalls's test results, and the ALJ considered the possibility than Ingalls may have misrepresented the severity of her impairments. (Tr. at 18). Nevertheless, the ALJ included limitations to account for Ingalls's vision issues. The ALJ also found two assessments by two non-examining physicians somewhat persuasive. (Tr. at 20). Although both determined that Ingalls could perform light work, the ALJ determined that she had additional "visual and environmental limitations as a result of the possible vision loss cause by the bilateral blepharospasms" that required a more limited RFC. (Tr. at 20).

In the end, the ALJ found that Ingalls had the RFC to perform light work but could not climb ropes, ladders, or scaffolds; could not perform work involving hazards such as moving machinery and unprotected heights; could only occasionally climb stairs and ramps; could only occasionally balance, crawl, kneel, stoop, or crouch; and could not perform work requiring excellent vision. (Tr. at 15). The ALJ found that Ingalls could avoid usual workplace hazards and work with small objects like nails, bolts, and screws. *Id*. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). Light work "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id*.

21

Although the ALJ noted that Ingalls had been diagnosed with venous insufficiency in both lower limbs in August 2019, he also found that she had been noncompliant with wearing compression garments as recommended by her doctor. (Tr. at 16-17). Nor had Ingalls had the radiofrequency ablation procedure her medical provider recommended in January 2019. (Tr. at 16). Although Ingalls claimed Nurse Practitioner Westwood prescribed a cane for ambulating within the home and rising from a seated position, the ALJ found that the cane was provided at Ingalls's request in 2018, well before the disability period began and prior to her venous insufficiency diagnosis, and that more recent evidence in the record—specifically a follow-up appointment in November 2021 where Ingalls reported she did not need a cane for ambulating—contradicted her need for the device. (Tr. at 17).

In this case, the ALJ properly considered all of Ingalls's impairments, both severe and non-severe, in determining her RFC. After careful consideration of the entire record, the ALJ crafted an RFC more restrictive than any examining or consulting physician had recommended to accommodate for Ingalls's impairments. Although Ingalls may believe that the ALJ should have assessed the medical evidence differently to support greater limitations, it is not the court's role to reweigh the medical evidence. *Schmitt v. Kijakazi*, 27 F.4th 1353, 1361 (8th Cir. 2022). Under these circumstances, substantial evidence supports the ALJ's RFC determination.

5.  VE Testimony

For her final point, Ingalls argues that although the ALJ found that she could not work around moving machinery, two of the jobs the VE testified Ingalls could perform—collator operator and garment bagger—both required her to use machinery. Although Ingalls maintains that this unresolved discrepancy requires reversal, there is no conflict between the VE's testimony and the DOT.

Ingalls had no past relevant work, so the question at step five was whether she could perform other work existing in significant numbers in the national economy. If answered affirmatively, then substantial evidence supports the ALJ's finding that she was not disabled. 20 C.F.R. § 416.920(a)(4)(v).

The ALJ asked the VE whether jobs existed in sufficient numbers in the national economy for a person Ingalls's age, education level, and work experience who was limited to light work with "[n]o ropes, ladders, or scaffolds and no hazards, including moving machinery and unprotected heights; occasional stairs and ramps, balance, crawl, kneed, stoop, and couch. The person cannot do work requiring excellent vision but can see well enough to avoid usual workplace hazards and can work with small objects." (Tr. at 42). The VE answered yes and supplied three jobs—garment bagger, collator operator, and toll collector. *Id*. Machines are mentioned in two of the job descriptions, garment bagger and collator operator. Specifically, garment bagger includes the following description:

> Covers garments or household articles with plastic or paper bags by any of
> following methods: (1) Hangs garment or article on stand and covers with
> plastic bag. (2) Pulls plastic from rolls, sliding plastic material over article and
> tearing plastic at perforations to form bag of desired size. (3) Hangs garment
> on holder in machine and pulls plastic from roll to envelop garment. Pushes
> button or moves lever to close heating irons that cut and seal plastic to form
> bag of desired dimensions. Hangs bagged article on slide rail or rack. (4)
> Drops shirts or folded articles into machine that automatically envelops
> articles in plastic bags and drops articles into box. Removes boxes from
> beneath machine when filled and replaces boxes.

DOT 920.687-018. Likewise, collator operator "tends machine that assembles pages of printed material in numerical sequence: Adjusts control that regulates stroke of paper pusher, according to size of paper. Places pages to be assembled in holding trays. Starts machine. Removes assembled pages from machine." DOT 208.685-010. The final job, toll collector, makes no reference to machinery. DOT 211.462-038.

There is no unresolved conflict between the VE's testimony and the DOT. The hypothetical posed to the VE did not prohibit Ingalls from exposure to all machinery. Rather, it restricted her from work involving "hazards including moving machinery." Although two of the jobs identified by the VE reference the use of machines, based on their occupational definitions, those jobs do not include hazardous moving machinery. In fact, the description for collator operator involves using a machine akin to a copier. As for garment bagger, while the work may include pushing a button or lever and hanging clothing on a machine, the work itself does appear to involve hazardous moving machinery. Toll collector involves no machinery at all.

24

Even assuming there was an unresolved conflict, any error is harmless because the VE testified that Ingalls could perform other work as a toll collector, which did not involve machinery. Consequently, substantial evidence supports the ALJ's finding at step five that Ingalls was able to perform jobs that existed in significant numbers in the national economy.

**IV.**   **Conclusion**:

For the reasons stated above, the Court finds that substantial evidence supports the decision that Ingalls was not disabled and recommends that Judgment should be entered in favor of the Commissioner.

IT IS SO RECOMMENDED this 4th day of April, 2024.

_____

UNITED STATES MAGISTRATE JUDGE